Conan Trust Under Agreement, Raymond W. Higgins and Charles H. Thornton, Trustees v. Commissioner.
Conan Trust v. Commissioner
Docket No. 106878.
United States Tax Court
1943 Tax Ct. Memo LEXIS 138; 2 T.C.M. (CCH) 703; T.C.M. (RIA) 43401; August 30, 1943
*138 Petitioner sold to a corporation some of the latter's stock under a court order requiring the corporation to hold the stock for resale for thirty days. Some of the shares were resold in that period and the remainder, at the expiration of the period, were cancelled by the corporation. Held, in so far as petitioner was concerned the disposition by it of the stock was a sale and not a partial liquidation. John E. Hughes, Esq., James G. Nye, Esq., Alworth Bldg., Duluth, Minn., and Lawrence R. Graving, C.P.A., for the petitioner. John D. Kiley, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion This proceeding is to test the correctness of respondent's determination of an income tax deficiency for the fiscal year ended February 28, 1939 in the sum of $38,376.85. The sole question is whether an admitted gain should be taxed in its entirety as a partial liquidating distribution under section 115 (c) of the Revenue Act of 1938, or only in part, as gain from the sale of a capital asset within the purview of section 117. The return was filed in the district of Minnesota. Findings of Fact Petitioner is a trust created in 1926, having fourteen beneficiaries. Since *139 1936 the surviving trustees have been C. H. Thornton and R. W. Higgins. Thornton is also a beneficiary of the trust, with a one-seventh interest therein, as is Higgins' wife. Among the securities originally transferred to the trust were $700,000 par value bonds of the Bankers Joint Stock Land Bank of Milwaukee, Wisconsin. That bank went into receivership in 1927 and a corporation known as Bankers Farm Mortgage Company was organized in 1931 to take over and liquidate its assets. The stock of the latter company was placed in a voting trust and petitioner received a voting trust certificate representing 7,000 shares of its stock in exchange for its $700,000 par value bonds. Prior to the transaction in controversy petitioner had received upon said shares of stock the sum of $717,500 as liquidating dividends. Each of the trustees of petitioner was the owner in his individual capacity of bonds of the Bankers Joint Stock Land Bank and thereafter of stock in the Bankers Farm Mortgage Company. They were active in the negotiations leading to creation of the Bankers Farm Mortgage Company, Thornton being one of the three incorporators thereof, a director, officer and one of the voting trustees. *140 Higgins was a director from the time the company was organized. When liquidation of the assets of the bank had proceeded to a certain extent it was thought desirable to dispose of the remaining assets as a whole. Two offers were received and while the second was being considered Thornton made an offer in writing, dated March 7, 1938, to the holders of voting trust certificates of Bankers Farm Mortgage Company to purchase any or all of their certificates for $22 per share, a sum greater than any previous offer. There were approximately 45,000 shares of Bankers Farm Mortgage Company stock outstanding, and within the 60 days limited by Thornton in his proposal the offer was accepted by all the stockholders except petitioner, which owned 7,000 shares, and scattered shareholders owning approximately 1,800 other shares. Higgins individually was among those who accepted Thornton's offer. It was determined by the trustees of petitioner that the matter of selling its stock in Bankers Farm Mortgage Company to Thornton, one of the trustees, should be submitted to the court having jurisdiction of the trust, but for various reasons this could not be accomplished within the 60-day period of the *141 offer. Thornton advised Higgins, however, that the offer would remain open as to petitioner until court instructions could be had. Subsequently, Thornton became unwilling or unable to purchase petitioner's 7,000 shares for cash, and he therefore made several proposals for the purchase of the shares upon a deferred payment basis. On August 13, 1938 the board of directors of Bankers Farm Mortgage Company passed a resolution authorizing the company to purchase the 7,000 shares of its stock owned by petitioner at $22 per share, "provided the same be approved by the proper court in Duluth at proper showing to the court of all pertinent facts." An oral offer was thereupon made to petitioner by the company to purchase its stock. On or about August 15, 1938, Higgins as trustee filed a petition in court reciting the above facts, among others, and requesting instructions concerning the disposition to be made of the shares. On August 17, 1938 a letter signed by Thornton and Higgins as trustees was mailed to each of the beneficiaries of the trust. The letter advised the latter of Thornton's offer and the inability of the trust to secure court approval of a sale by petitioner within the 60 days. *142 It stated: - * * * We now have a proposal which is different from the original, but the results to the Trust are precisely the same. The difference is that we now have an offer from the Bankers Farm Mortgage Company to purchase for retirement the 7,000 shares of stock we still hold at $22 per share. Cash is to be paid when we deliver our stock certificates. The beneficiaries were advised that the trustees thought the offer should be accepted for the best interests of the trust and that a hearing in court would be held upon the petition of the trustees to approve the disposition. Hearing was had upon the petition of the trustees regarding the contemplated disposition, at which objection was made by one of the beneficiaries. Largely to meet this objection the proposed transaction was modified. On October 5, 1938 the board of directors of Bankers Farm Mortgage Company adopted a resolution to the effect that its prior resolution of August 13, 1938, referred to hereinbefore, be supplemented as follows: - * * * When and if said stock shall be acquired by the company, the company shall place the same in the Marshall & Ilsley Bank in Milwaukee, Wisconsin, and shall promptly notify the *143 beneficiaries of the Conan Trust Company who shall have thirty days from the date of such notice within which to purchase from the Bankers Farm Mortgage Company their respective shares in said stock at the purchase price, to wit, $22.00 per share. Further resolved that all stock so purchased not resold under said option shall be retired and cancelled. The court entered its findings and order on November 14, 1938. It found that the price of $22 per share was fair and the largest amount obtainable therefore and that the proposed transaction, as modified by court order, was fair and just and consented to by all the beneficiaries who had appeared. The trustees were authorized and instructed to accept the offer of Bankers Farm Mortgage Company of $22 per share cash, and to transfer the 7,000 shares to the Bankers Farm Mortgage Company upon payment of that amount per share. Such authority and direction, however, were subject to the condition that Thornton should cause the Bankers Farm Mortgage Company to deposit in escrow 7,000 shares of its stock; that the trustees should notify each of the beneficiaries of petitioner of such deposit and of the fact that for thirty days after such notice *144 each beneficiary would have the option to purchase shares of such stock at $22 per share cash in the same proportion as was his interest in the trust; that upon such payment the escrow agent would deliver such shares to any beneficiary exercising said option; and that at the end of such thirty-day period all stock remaining unpurchased would be returned to Bankers Farm Mortgage Company. The court further ordered that as to any beneficiary who, prior to the notice of deposit in escrow, should waive in writing his right to purchase such stock, no stock representing such beneficiary's share need be deposited in escrow. On or about November 15, 1938 the voting trust certificate for 7,000 shares of stock was delivered to the Bankers Farm Mortgage Company, and that company paid to petitioner $154,000 therefor. On November 23, 1938 a stock certificate for 7,000 shares was issued in the name of petitioner, endorsed by it in blank, and delivered to the escrow agent. Notice of this deposit was given by the trustees to the beneficiaries on November 30, 1938. One of the beneficiaries exercised her option and purchased 500 shares of said stock. On December 3, 1938 certificates for 500 shares *145 were issued to her; and a new certificate for 6,500 shares in petitioner's name was substituted with the escrow agent. At the expiration of the escrow period, on or about December 31, 1938, said certificate was returned to the Bankers Farm Mortgage Company, was attached to its stub in the stock certificate book, and marked "cancelled" across its face in red ink. On the cash book of Bankers Farm Mortgage Company the amount of $154,000 was debited to treasury stock on November 15, 1938. Treasury stock was credited with $11,000 to record the sale of 500 shares to one of petitioner's beneficiaries. The balance in the treasury stock account was closed out as of December 31, 1938, and "Capital Stock Subscribed" account was reduced $570,265 "to record retirement of 6,709 shares of capital stock". These comprised 6,500 shares acquired from petitioner and 209 shares acquired from miscellaneous shareholders in September, October and November 1938. The general ledger reflected 45,262 shares outstanding on January 1, 1938 and 38,553 shares on December 31, 1938. Petitioner reported the entire amount of $154,000 in its return for the tax year as a long-term capital gain, of which $77,000 was treated *146 as taxable income. The Commissioner determined the $143,000 of the total amount received was taxable 100 per cent as a distribution in liquidation of 6,500 shares of Bankers Farm Mortgage Company stock, and that the disposition of the remaining 500 shares constituted a sale within the meaning of section 117 of the Revenue Act of 1938, the gain on which, amounting to $11,000, was taxable to the extent of 50 per cent. The transaction by which petitioner disposed of 7,000 shares in the Bankers Farm Mortgage Company constituted a sale rather than the receipt of a liquidating distribution. Opinion ARUNDELL, Judge: There is no dispute between the parties as to the underlying reasoning that must govern the disposition of this controversy. If what the petitioner received from the Bankers Farm Mortgage Company for the 7,000 shares of its stock was a liquidating dividend, as defined in section 115 (i) of the Revenue Act of 1938, section 115 (c) determines the manner of taxing it. [1] But if the transaction between the parties may be characterized as a sale, the profit is taxable under section 117 as a capital gain. *147 The resolution of the company and the communication addressed to the beneficiaries of petitioner by its trustees specifically mentioned thee proposed transaction as a purchase for retirement, and if the shares had been surrendered pursuant to this offer we might have no difficulty in treating the matter as a liquidation. Although the transaction may have started out as a proposed liquidation it required court approval for its consummation, and the court permitted petitioner to sell the shares to the corporation only if the latter would hold them for 30 days and, during that period, offer them for sale to the beneficiaries of petitioner at the same price at which the purchaser acquired them. During this period the shares were held by the company as treasury stock, and as to the 500 shares that were resold, there obviously was no cancellation or redemption and, consequently, no liquidating distribution to petitioner. Respondent concedes that this is so, but argues that the picture is different regarding the other shares. Nevertheless, all 7,000 of the shares were subject to this contingency during the thirty-day period. The chief difficulty with respondent's position is that it requires *148 the use of hindsight to determine the taxable nature of the transaction. Petitioner disposed of the stock and received payment therefor in the middle of November. That was a closed and completed transaction. There was no way of knowing at that time what ultimately would happen to the shares. All of them may have been retired or they all may have been resold. Yet, so far as petitioner was concerned the transaction was ended. Respondent's position, based upon subsequent events, would lead to embarrassment if, for example, the escrow period had extended into petitioner's next taxable year. The truth of the matter is that at the time of the completed transaction no one could say whether the shares would be cancelled or retired or reissued, and what would be done was beyond the control of petitioner and the Bankers Farm Mortgage Company. In this sitution we cannot hold that what petitioner received was a "distribution by a corporation in complete cancellation or redemption of a part of its stock." Upon the contrary it appears to us that petitioner sold the stock. The transaction took the form of a sale and originated in negotiations between petitioner and an individual, to which the *149 corporation was not a party at all. Our conclusion that it is to be treated as a sale for tax purposes does no violence to the letter or spirit of the statutory provisions in contingency. Such provision was added in the Revenue Act of 1934 "to prevent avoidance of surtax [upon corporate earnings] through liquidating dividends," House Report 704, p. 29, Senate Report 558, p. 37, 73d Cong., 2nd Session; it was eliminated from section 115 (c) of the Internal Revenue Code by section 147 of the Revenue Act of 1942; and that was done in the belief that section 115 (g) would adequately serve the desired purpose of preventing the distribution of ordinary dividends under disguise. House Report 2333, p. 93, Senate Report 1631, p. 116, 77th Cong., 2nd Session. While this, of course, does not mean that in the intervening years a partial liquidating dividend will not be taxed as a short-term capital gain, it demonstrates that we do not have here the type of situation that was sought to be prevented; and accordingly we see no reason for refusing to recognize that the transaction in question was in form and substance a sale. Decision will be entered under Rule 50. Footnotes
1. SEC. 115. DISTRIBUTIONS BY CORPORATIONS. * * * * *
(c) Distributions in Liquidation. - Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112. Despite the provisions of section 117, the gain so recognized shall be considered as a short-term capital gain, except in the case of amounts distributed in complete liquidation. * * * * *
(i) Definition of Partial Liquidation. - As used in this section the term "amounts distributed in partial liquidation" means a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock.↩